UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                MEMORANDUM & ORDER

      v.                                            02-CR-307 (NGG)

JOSEPH MASSINO, et. al.,

          Defendants.
--------------------------------------------------------X
GARAUFIS, United States District Judge.

      Journalist Jerry Capeci applied on January 11, 2005 for an order directing the government to make copies of five tape recordings introduced into evidence during the trial of United States v. Massino, No. 03 Cr. 307 ("Massino I") available to him and to any other member of the press who requests similar access.[1]  The Government responded on January 19, 2005, opposing Capeci's application and requesting a protective order precluding the duplication of the requested recordings.  In his reply papers, dated January 24, 2005, Capeci clarified that his request extends only to the portions of the recordings that, as redacted, were played for the jury at trial.  For the reasons set forth below, Capeci's application is granted and the Government's request for a protective order is denied.

**I.    Factual Background**

      Five partial recordings—edited portions of longer consensual recordings gathered by cooperating witness James Tartaglione during the Government's investigation into the Bonnano

---

[1] Applicant Jerry Capeci is a veteran New York City newspaper journalist and author specializing in organized crime, in particular the activities of La Cosa Nostra.  Capeci currently writes a weekly column for the New York Sun which he also publishes on his internet website, www.ganglandnews.com.

1

organized crime family—were introduced into evidence during the first Massino trial as Government Exhibits 216-B, 217-B, 218-B, 219-D and 220-B. These redacted recordings were not played over speakers in open court, largely because it was determined that the relatively poor sound quality of the audio recordings would make it difficult for both the jurors and members of the public to comprehend the contents of the recordings were they amplified using the equipment available to the court. The jurors therefore listened to the recordings through headphones, and the prosecutors, defendant and defendant's counsel and the court listened simultaneously through headphones as the recordings were played for the jurors. At the end of each trial day and during breaks, members of the press were allowed to listen to the same segments of the recordings that were played for the jury while reviewing the transcripts of those recordings that were provided by the Government. (Massino I, Transcript ("Tr.") 4700). Members of the press were not permitted to keep the transcripts provided as listening aids, however, since the transcripts themselves had not been admitted into evidence. (Massino I, Tr. 4919-20). No restrictions were placed upon the ability of the press to report on the contents of those tapes during the trial and thereafter.[2]

Massino's trial was only one in a series of anticipated trials involving serious allegations against reputed members and associates of the Bonnano crime family. Approximately two-dozen other alleged members and associates remain under indictment pending trial in United States v. Anthony Urso, et. al., No. 03 Cr. 1382, United States v. Joseph Massino, et. al., No. 03 Cr. 0929 ("Massino II"), and United States v. Vincent Basciano and Dominick Cicale, No. 05 Cr. 0060.

---

[2] The transcripts were provided to the jurors as a listening aid, but were not entered into evidence. The jurors were therefore instructed that if there were any discrepancies between the transcripts and what they heard on the tapes, their own perception of the words on the tapes should be used in reaching their verdict.

Many of the remaining defendants are charged with murder in aid of racketeering, conspiracy to commit murder in aid of racketeering, attempted murder, or other serious crimes such as loansharking and narcotics trafficking. The Government intends to use portions of the edited tapes (and possibly other portions of the complete recordings) as evidence in at least two of these trials. (Gov't Br. at 13). Defendant Vincent Basciano is alleged to have been a participant in one of the conversations captured in the recordings played for the <u>Massino I</u> jury, and the remaining portions of these tapes could include statements made by other defendants, or which inculpate the participants or other defendants in crimes charged in the pending indictments. Accordingly, in an order dated January 12, 2005, I gave notice of Capeci's application to all remaining defendants in the <u>Urso</u> and <u>Massino II</u> indictments, and requested briefing from any interested defendant on whether the application should be granted.[3] Only counsel for Joseph Massino, against whom former Attorney General John Ashcroft has announced his intention to seek the death penalty, responded in opposition to the application. Defendants Vincent Basciano and Dominick Cicale have also been indicted for death-eligible crimes, and pending the Attorney General's review, may also be subject to a death penalty prosecution.

The Government contends that Capeci should not be permitted to copy and disseminate the contents of the redacted recordings for the following reasons: (1) due to the Government's concern for the safety of its cooperating witnesses and their families; (2) because release "may

---

[3] The indictment in the third Bonnano case, 05 Cr. 0060, was not handed down by the grand jury until January 26, 2005 and was first unsealed on January 27, 2005. Counsel for Dominick Cicale therefore did not have an opportunity to be heard on this issue. Cicale's name is mentioned in Government Exhibit 220-B, allegedly by his sole co-defendant in the indictment, Vincent Basciano. Basciano is also named in 03 Cr. 0929, and therefore was notified of Capeci's request.

impinge on the trial rights of [the remaining] defendants," (Gov't Br. at 14) including, presumably, their right to have an impartial jury empaneled; (3) because there is no legitimate public interest at stake in being able to listen to the tapes; and (4) because duplication of these recordings may have a "chilling effect" on the future willingness of cooperating witnesses to record conversations with co-conspirators.  The Government also notes that Capeci publishes his work on the internet, as well as in print, and that "the permanence of the recordings on the internet" is a significant source of the Government's concerns about allowing the duplication of the redacted recordings.  (Gov't Br. at 11).  The Government contends that in light of these concerns, its offer to allow Capeci to listen to the redacted tapes on-site at the U.S. Attorney's office constitutes a reasonable compromise between Capeci's interest in accessing materials that were played for the jury at trial and the Government's interest in limiting the dissemination of those materials while it proceeds with its prosecution of the Bonnano crime family.  Capeci disagrees, and therefore brings this application to compel the Government to provide him with duplicate copies of the trial recordings.

**II.     Discussion**

In contesting Capeci's demand for an opportunity to duplicate the redacted tapes, the Government argues that the presumption of public access to materials that were entered into evidence and heard by the triers of fact at trial is overcome in this case by "extraordinary circumstances."  (Gov't Br. at 10).  The Government also asserts that in any event, given the circumstances of this case, the public's interest in accessing court documents can be sufficiently protected by the Government's offer to allow Capeci to listen to, but not copy, the redacted tapes. I disagree with both the contention that circumstances are presented here that outweigh the strong

4

presumption of access to evidence admitted at trial, and the proposition that the right of access may be bifurcated under the law of this Circuit in the manner suggested by the Government. The Government therefore must permit Capeci to copy the redacted tapes.

    A.    The Common-Law Right of Public Access to Court Materials

At least since the Supreme Court's decision in Nixon v. Warner Communications, it has been clear that the public possesses a broad right to inspect and copy court documents. 435 U.S. 589, 597-98 (1978). This right is not rooted in the Constitution, but derives rather from the public's common law interest in being able to monitor the operations of the courts and other public agencies. Id. at 597-98 and 608-10; see also Siedle v. Putnam Invs., 147 F.3d 7, 10 (1st Cir. 1998). This interest creates a rebuttable presumption that the public is entitled to access court documents and other materials that may have influenced judicial decisions affecting the substantive rights of litigants. United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995). The right to access varies in accordance with the degree to which the court's Article III functions are implicated by the presentation of the disputed materials to the court. Id. at 1049-50. Accordingly, because materials admitted into evidence and presented to the trier of fact are presumed to bear directly on the outcome of a trial, the presumption of public access is at its strongest when courts consider whether the public should have access to trial evidence. See In re Application of Nat'l Broad. Co. (United States v. Myers), 635 F.2d 945, 952 (2d Cir. 1980) (hereinafter, "Myers").

This common-law right of access is not absolute, however. The right merely creates a presumption of access that, however strong, may be overcome in a particular case by competing concerns. United States v. Graham, 257 F.3d 143, 149 (2d Cir. 2001). These interests include a

5

criminal defendant's right to a fair trial, privacy rights in cases involving materials that are particularly embarrassing to innocent parties, and the safety of third parties. Amodeo, 71 F.3d at 1047-50; United States v. Beckham, 789 F.2d 401, 409 (6th Cir. 1986).

Trial courts are vested with discretion to weigh these factors against the presumption of access and to decide on a case-by-case basis whether to order a release of the materials in question. Nixon, 435 U.S. at 599. However, that discretion is significantly circumscribed in this Circuit by the powerful presumption in favor of access that is applied to disputes of this kind. As the Second Circuit has explained, once materials have been introduced into evidence in a public proceeding, "it would take the most extraordinary of circumstances to justify restrictions on the opportunity of those not physically in attendance at the courtroom to see and hear the evidence, when it is in a form that readily permits sight and sound reproduction." Myers, 635 F.2d at 952.

B.      Capeci's Application

The Government asserts that this case involves precisely the kind of extraordinary circumstances that tip the balance in favor of restrictions on access to materials admitted into evidence at trial and presented to the jury. As noted above, the factors cited by the Government in support of this argument are the following: (1) the safety of the Government's witnesses and their families, particularly given the "special concerns" presented by the likelihood of internet publication; (2) the possibility of jury pool contamination, especially in light of the upcoming death penalty trial of Joseph Massino; (3) the limited public benefit that would accrue from broader distribution of the recordings; and (4) the "chilling effect" that release might have on the willingness of future cooperators to create consensual recordings in the future. These factors, the Government argues, outweigh the presumption of access, or at the very least, suggest that in this

case, the presumption of access should not extend to duplication. Thus, the Government urges the court to limit access to on-site inspection or, if copying is allowed, that it be deferred until after the conclusion of the pending trials.

I am unpersuaded that the factors cited by the Government, taken individually or collectively, are of sufficient weight to overcome the strong presumption in favor of access applied under Myers to materials which have been introduced into evidence at trial and presented to the jury. Below, I address each of the concerns raised by the Government with respect to this issue:

>  (1)   Security Concerns

The Government contends that "duplication of the requested consensual recordings, or any portion of them, raises security concerns with regard to cooperating witnesses and the family members of cooperating witnesses who are innocent third parties." (Gov't Br. at 11). This is particularly so, according to the Government, because "the Government has obtained information about specific threats to the family members of cooperating witnesses" and because the "duplication of these recordings for publication on mediums such as the internet create[s] a different and more significant security risk." Id.

Potential threats to the life and health of Government cooperating witnesses and innocent third-parties cannot be taken lightly, and efforts to intimidate witnesses and potential cooperators through the use of violence are hardly unknown to organized crime. But it is difficult to comprehend just how or why the dissemination of the redacted recordings at issue here would increase the risks faced by Tartaglione or other cooperators and members of their families. In light of the extensive media coverage of the Massino I trial, the contents of the redacted tapes are

easily discoverable by anyone with an interest, benign or otherwise, in the Government's ongoing efforts to prosecute organized crime. It is also no secret that it was Tartaglione who agreed to wear a recording device for the Government, as he testified to that fact in open court during the Massino I trial. Given that the publication of the redacted recordings would not release any new substantive information to the public whatsoever, it is difficult to regard the security concerns raised by the Government as anything other than purely speculative. In my view, such speculation is insufficient to justify restricting access to materials that have been entered into evidence in a public trial. See, e.g., In re Application of American Broadcasting Cos., 537 F. Supp. 1168, 1172-73 (D.D.C. 1982) (acknowledging that the broadcast of the recordings in issue might endanger Jodie Foster, an innocent third-party to the government's efforts to prosecute John W. Hinckley, Jr. in the attempted assassination of President Reagan, but nonetheless concluding that this concern was outweighed by the common law right of access where the recordings had been part of the trial evidence against Hinckley).

Nor am I persuaded that, under the circumstances of the present case, the bare fact that Capeci might publish the redacted recordings on the internet should be considered in any way as a factor against allowing duplication. For starters, the basic logic of the public access presumption, particularly as it applies to the media, is that access to trial evidence should be made available, where possible, to interested members of the community who are unable to be present in court on the day that the evidence is presented to the jury. Myers, 635 F.2d at 952. The internet's capacity to disseminate information to those who live beyond the usual reach of metropolitan New York media outlets therefore speaks in favor of, rather than against, equal access for web-based journalists.

Second, the potential implications of the Government's "the internet is different" approach are far too broad. Nearly every news organization that covers judicial proceedings has a presence on the internet, and uploading audio, visual, video or print information onto such a website is a relatively simple matter. Further, as the Government concedes, First Amendment concerns would likely bar the Government or the court from allowing a news organization to publish a sound recording only in print or on radio or television while barring that same organization from publishing the recording on the internet. (Gov't Br. at 11 n.6). The Government's argument in favor of restrictions on press access therefore would apply equally to any media organization with a web presence, not simply to "internet journalists" like Capeci. Such a restriction is warranted neither by the facts of this case nor the governing precedent of this Circuit. Accordingly, I do not believe that the likelihood that the contents of the redacted tapes, if duplicated, might find their way to the internet should factor into this court's decision on the merits of Capeci's application.

    (2)   The Trial Rights of the Defendants

The Government next argues that "duplication of the requested recordings may impinge on the trial rights" of defendants facing future trials. (Gov't Br. at 13-14). Counsel for defendant Joseph Massino weighs in on the same score, arguing that in her client's case, "the dissemination of these recordings to the general public has the very real potential to irreparably prejudice the jury pool unduly burdening Mr. Massino's right to be tried by an impartial jury."[4] The Government and Massino are in agreement that the possibility of jury pool contamination should

---

[4] By letter of Flora Edwards, dated January 17, 2005. Edwards has since withdrawn as counsel for Massino. However, in the absence of any indication to the contrary, I presume that this letter continues to reflect Massino's position with respect to Capeci's application.

9

factor resoundingly in the court's consideration of the instant request, where Massino faces the death penalty for the crimes charged against him in the second indictment.

(a)     Jury Contamination, Generally

The general proposition that the possibility of jury contamination should outweigh the presumption of public access to materials entered into evidence at trial has been emphatically rejected by the Second Circuit, which addressed this concern in the following way:

> The opportunity for voir dire examination still remains a sufficient device to eliminate from jury service those so affected by exposure to pre-trial publicity that they cannot fairly decide issues of guilt or innocence.  In relying on voir dire, we do not suggest that the televising of the tapes . . . will not be seen by some persons who might be called for jury service in subsequent [related] cases.  We are satisfied, however, that voir dire inquiry can identify them and elicit a basis for excusing from the venire those viewers whose impartiality has been impaired.  We do not believe the public at large must be sanitized as if they all would become jurors in the remaining [] trials. The alleged risk to a fair trial for the [] defendants yet to be tried is too speculative to justify denial of the public's right to inspect and copy evidence presented in open court.

Myers, 635 F.2d at 953-54.  Reaff'd in United States v. Graham, 257 F.3d 143, 155 (2d. Cir. 2001).

This Circuit's conclusion that a jury pool is unlikely to be tainted beyond repair by the widespread airing of audio recordings by the media is particularly robust in this case.  The Eastern District of New York is not a small town with one newspaper and one radio station.  Rather, approximately eight million people of astonishing ethnic, religious, cultural, vocational and socioeconomic diversity reside within the five counties that comprise this judicial district.  Many of these residents, whether because of lack of time or interest, simply do not follow the crime reports contained in the news, or if they do, are able to maintain a posture of impartiality

between the Government and the defense if selected for jury duty. Therefore, while I recognize the seriousness of the jury taint concerns raised by the Government and Massino, I am also persuaded that an impartial jury can be impaneled for each of the upcoming trials involving alleged members and associates of the Bonnano crime family. Even if I were not so persuaded, the clear preference of this Circuit is to permit a change of venue or continuance if an impartial jury cannot be impaneled through voir dire, rather than to restrict public access to materials to which the strong presumption of public access clearly has attached. Myers, 635 F.2d at 953 n. 9. Accordingly, the general concern that the jury pool may be contaminated by the publication of the redacted tapes is insufficient to prevent Capeci from duplicating the tapes.

(b) Jury Contamination in a Capital Case

Massino and the Government do not rely solely on this general proposition, however. Instead, they point to the fact that the Attorney General has authorized the prosecution to seek the death penalty against Massino in Massino II in support of their contention that "extraordinary circumstances" are present here, and that Capeci's application therefore should be denied.

Death penalty cases, as the federal courts have repeatedly acknowledged, are indeed different. From selection of counsel, through discovery to jury selection, in the bifurcation of the guilt and penalty phases, and down to the additional opportunities for collateral review granted to those sentenced to death, the courts are on notice to be particularly vigilant in protecting the trial rights of defendants facing the ultimate punishment. Yet neither Massino nor the Government has directed this court to any precedent in support of the proposition that this heightened concern for the capital defendant's rights should lead this court to prevent Capeci from duplicating the tapes introduced into evidence during Massino's first trial, and neither seems able to articulate

11

why the prospect of death should change the court's analysis of this question, other than to postulate that Massino's death-eligibility "cannot be ignored." (Gov't Br. at 14).

If voir dire, continuance and change of venue are sufficient to safeguard a defendant's right to an impartial jury in the type of high-profile case in which members of the public and press are likely to demand access to court materials, then it is unclear why these same instruments cannot also serve to protect the interests of a high-profile, death-eligible defendant. This court intends to vigorously ensure that Massino's trial rights are protected if Attorney General Gonzalez stands by his predecessor's decision to seek the death penalty against Massino. However, the proper means of ensuring that Massino's fate is decided by an impartial jury is through the searching voir dire that this court intends to administer and, if necessary, via continuance or change of venue; it is not by attempting to stuff the genie of the Tartaglione tapes back into the Government's bottle of state secrets, and thereby depriving the public of its ability to scrutinize part of the evidence that contributed to Massino's recent convictions.

(3)     Legitimacy of the Public Interest in the Recordings

The Government next asserts that Capeci should not be permitted to duplicate the redacted recordings because "there is no apparent benefit to the public to allow duplication of the requested materials" in that the prosecution of organized crime defendants "does not extend to the core issues of democracy at stake in public corruption cases." (Gov't Br. at 14). Relatedly, the Government suggests that "duplication of these recordings may only serve to glorify the violence practiced by the [La Cosa Nostra] organized crime families." Id. at 15.

These arguments are without merit. The robustness of the public access presumption is not confined, as the Government suggests, to cases in which Government officials have been

12

accused of misconduct. Rather, as the Second Circuit has recognized, the transparency and legitimacy of the judicial process is <u>always</u> implicated when a federal court receives information into evidence, and assesses that information in the course of discharging its Article III duties. See <u>Amodeo</u>, 71 F.3d at 1049; <u>Graham</u>, 257 F.3d at 150-51. There may well be situations in which the purported public interest in the materials sought is purely salacious, in which the privacy interests of the parties outweigh the public interest in being able to monitor the exercise of judicial power, or in which the Government is required to present information to the court that it may legitimately withhold for a time from the general public, and where the presumption of public access is thereby weakened. <u>Nixon</u>, 435 U.S. at 598. However, the trial at which these redacted tapes were presented was a centerpiece of the Government's ongoing efforts to stamp out organized crime in this District. As the Government acknowledges, this effort is a matter of vital public concern. (Gov't Br. at 14). It surely follows that the public has a legitimate interest in being able to review materials that helped to ensure that the reputed boss of a notorious organized crime family will spend the rest of his natural life in a federal prison. The Government's contention that the duplication of the redacted recordings does not advance a legitimate public interest is therefore fatally flawed.

     (4)  The "Chilling Effect" on Future Investigations

The Government also contends that "duplication of these recordings may have a chilling effect on ongoing and future law enforcement investigations in which witnesses are asked to consensually record conversations." (Gov't Br. at 14). I fail to see why this would be so, or what weight this argument would deserve in this analysis even if this assertion had been more completely and persuasively articulated in the Government's papers.

Presumably, the Government's cooperating witnesses understand that if they agree to wear a recording device in meetings with their associates, the fact of their cooperation will become a matter of public record if the Government decides to make it so by securing an indictment and moving to trial. These cooperating witnesses must also understand that if the Government decides that its case will be strengthened by playing the consensual recordings at trial, or by having the cooperators testify at trial, their actions will be further exposed to the light of public scrutiny. Nor can cooperating witnesses reasonably expect that the recordings they make will be played only once in public—in Tartaglione's case, it is apparent that the Government will seek to introduce the recordings into evidence at several organized crime trials, and has included portions of the transcript of those recordings in filings with the court. Capeci's request to duplicate the portions of the recordings that were played to the Massino I jury does not change the reality facing potential cooperating witnesses. That reality is that the Government will use consensual recordings that are provided by cooperating witnesses as often as it likes, and in as public a forum as necessary to achieve its ends, and that when the Government does so, the fact that an individual decided to cooperate with the prosecution likely will be reported by the press. As a result, this court is not persuaded that potential cooperators will be dissuaded from assisting law enforcement officials by the mere prospect that the recordings they make will be made available to journalists _after_ the Government has published the recordings to a jury in a public trial.

      (5)    <u>Bifurcation of the Right: Access and Duplication</u>

The Government's final argument in support of its contention that Capeci's request should be denied is that even if the right of access is not overcome by the concerns proposed by

14

the Government, the Government's offer to allow Capeci to listen to the tapes, but not to duplicate them, is sufficiently responsive to that right. In so arguing, the Government relies heavily on the First Circuit's decision in In re Providence Journal, 293 F.3d 1 (1st Cir. 2002), wherein the court held that the public right of access did not impose an affirmative obligation on the court to re-create a set of audio clips that were played *ad hoc* for the jury. Id. at 16-17. Because the factors that led the First Circuit to grant the media the right to listen to audio recordings played at trial while withholding the right to duplicate those materials are not present in this case, and because in any event, the law of the Second Circuit appears to proscribe such a result, I decline to bifurcate the right of access in the manner adopted by the First Circuit.

Historically, courts have defined the right of access as incorporating both the right to inspect court materials and the right to copy them. Myers, 635 F.2d at 950. That is, in ruling on access disputes such as the one presently before the court, courts typically permit or disallow both inspection and copying. See Nixon, 435 U.S. at 597 ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.") (emphasis added); see also Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 92-93 (2d Cir. 2004) (using the "inspect and copy" language from Nixon, 435 U.S. at 597, and citing same); Gardner v. Newsday, Inc. (In re Newsday, Inc.), 895 F.2d 74, 78 (2d Cir. 1990) (quoting same); In re Application of CBS (United States v. Salerno), 663 F. Supp. 1011, 1013 (2d Cir. 1987) (citing same); United States v. Kushner, 2005 U.S. Dist. LEXIS 452, *10 (D.N.J. 2005) (citing same); Marisol A. v. Giuliani, 1997 U.S. Dist. LEXIS 15705, *6 (S.D.N.Y. 1997) (quoting same).

The First Circuit's bifurcation of these elements of access in Providence Journal

15

represents an exception to this general approach. However, the First Circuit appears to have arrived at this unusual conclusion because the recordings that were played for the jury, and which the Providence Journal sought to copy, did not exist in an easily reproducible form. As the Providence Journal court described in distinguishing the facts before it from earlier access cases, including Myers, "[h]ere, the government has not merely played individual tapes, but, rather, has used cutting-edge technology . . . to play for the jury medleys of selected excerpts from the universe of taped material stored on its laptop computer. As a result, there is no electronic medium--no tape or CD-ROM--currently in existence that contains the precise medleys of taped excerpts that have been played in open court." Id. at 17. As such, the evidence heard by the jury was not "in a form that readily permits sight and sound reproduction. Id. (quoting Myers, 635 F.2d at 952). Given those circumstances, the First Circuit pronounced itself "reluctant to hold that the common-law right of access necessarily compels the creation (and, thus, the copying) of such materials." Providence Journal, 293 F.3d at 17.

Here, the government has not proposed that the edited tapes sought by Capeci are in a form unsuitable for duplication. Accordingly, I decline to follow the approach adopted by the court in Providence Journal. I instead adhere to what I take to be the clear instruction of Myers and its progeny: where the presumption of access attaches to court materials, is not overcome by countervailing concerns, and those materials can be easily reproduced, the common-law right of access embraces duplication as well as inspection.

### III. Conclusion

For the foregoing reasons, Capeci's application for an order compelling the government to release copies of Government Exhibits 216-B, 217-B, 218-B, 219-D and 220-B to him is

16

granted. The government's request for a protective order preventing such duplication is denied. The government is ordered to make copies of these redacted tape recordings available to Capeci within seven (7) days of the date of this order at a time convenient to both Capeci and the government.

SO ORDERED.

Dated: February 14, 2005  \_\_\_\_/s/_____
      Brooklyn, N.Y.                           Nicholas G. Garaufis
                                             United States District Judge