# SIMON & PARTNERS LLP
## THE FRENCH BUILDING
551 FIFTH AVENUE
NEW YORK, NEW YORK 10176
www.simonlawyers.com

(212) 332-8900

FAX: (212) 332-8909

BRADLEY D. SIMON
BRIAN D. WALLER
KENNETH C. MURPHY

NEW YORK
WASHINGTON, D.C.
PARIS

TERRENCE J. JOHNSON
MARK ELLIS
ANDRIA J. BOUSKOS

COUNSEL
PAMELA B. STUART
NEAL M. SHER
GENEVIEVE SROUSSI
STEPHENIE L. BROWN
HARRIET TAMEN

**SUBMITTED UNDER SEAL**

October 25, 2010

**Via Hand Delivery**

Honorable Nicholas G. Garaufis
Unites States District Judge
Eastern District of New York
United States Courthouse
Room 1416 S
225 Cadman Plaza East
Brooklyn, NY 11201

   Re: *U.S. v. Salvatore Vitale*
     **02-CR-307 (S-11)-01**

Dear Judge Garaufis:

  We submit this letter-memorandum on behalf of defendant Salvatore Vitale, who is scheduled to be sentenced on October 29, 2010. Mr. Vitale is a 63 year old military veteran with a history of serious health problems. He was also, for a time, the underboss of the notorious Bonnano crime family. After his arrest in January 2003, Mr. Vitale became one of the most significant government cooperators in modern history. This Court is in the unique situation of

SIMON & PARTNERS LLP

being intimately familiar with both Mr. Vitale's reprehensible crimes as well as his extraordinary cooperation. Indeed, over the course of many years, this Court has presided over several lengthy jury trials at which Mr. Vitale testified in great detail about both his own serious indiscretions as well as those of his numerous criminal cohorts. Between his exhaustive trial testimony, the detailed Pre-Sentence Investigation Report prepared by the United States Probation Department and the government's 122 page letter submitted pursuant to U.S.S.G. 5K1.1 and 18 U.S.C. 3553(e), there is little information about Mr. Vitale of which the Court is unaware. The objective of this memorandum, however, is to augment that information to assist the Court in imposing a just and appropriate sentence. Specifically, we respectfully request that Mr. Vitale, who has been incarcerated for nearly ten years, after accounting for likely good time credit, be given a sentence of time served.

I. **The Sentencing Guidelines**

The Pre-Sentence Investigation Report ("PSR") calculates Mr. Vitale's total adjusted offense level to be 49 (PSR ¶ 152) and his criminal history category as level II (PSR ¶ 158). The government has submitted a 122 page letter indicating its intention to move at sentencing, pursuant to U.S.S.G. 5K1.1 and 18 U.S.C. 3553(e), for a downward departure based on Mr. Vitale's extraordinary assistance with government investigations and prosecutions.

II. **18 U.S.C. § 3553(a)**

In the wake of United States v. Booker, 125 S.Ct. 738 (2005), the Second Circuit in United States v. Crosby, 397 F.3rd 103 (2d Cir. 2005), set forth guidance, instructing this court how to proceed to sentence. Honorable Judge Newman explained that although the Guidelines

2

are no longer mandatory, sentencing judges must still "consider" the guidelines along with the factors listed in 18 U.S.C. § 3553(a).

The statute 18 U.S.C. § 3553(a)(1) compels the broader consideration of the history and characteristics of the defendant (See e.g. U.S.S.G. §§ 5H1.1, 5H1.3, 5H1.5, 5H1.11). Pre Booker/Fanfan, these factors were severely limited to the criminal history category. Today, however, with the guidelines being advisory, consideration of the defendant's (a) age, (b) education and vocational skills, (c) mental and emotional condition, (d) physical condition including drug or alcohol dependence, (e) employment record, (f) family ties and responsibilities, (g) socioeconomic status, (h) civic contributions, and (i) reputation in the community are to be heavily weighed in imposing sentence.

In addition, 18 U.S.C. § 3662 provides that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence."

Once the applicable guideline range has been determined, the sentencing court should "consider" it along with all of the factors listed in § 3553(a). However, no Circuit Court has given specific guidance as to what weight should be given to the advisory guideline range or the factors enumerated under § 3553(a). It appears to be up to the court's discretion to determine what is reasonable under the circumstances of each case. More simply put, the sentencing judge is entitled to find all the facts appropriate for determining either a guideline sentence or a non-guideline sentence. Thus, for the reasons stated below, we believe that consideration of all the § 3553(a) factors compels the imposition of a sentence of time served.

### III. Personal History

Salvatore Vitale was born on September 22, 1947. He is presently 63 years old. Mr. Vitale's parents raised him and his three sisters in a stable, but low-income household. (PSR ¶ 163). His father worked as a dishwasher and baker, and his mother was employed as a seamstress. (PSR ¶ 162). Mr. Vitale had a good relationship with his parents and he lived with them until he was married. (PSR ¶ 164).

Mr. Vitale graduated from high school in 1965 and had good attendance and average grades. (PSR ¶ 175). In 1966, Mr. Vitale joined the United States Army where he received airborne training. He was honorably discharged from active duty in 1968 and honorably discharged from his reserve duties in 1972. (PSR ¶ 185). After holding a few small jobs, Mr. Vitale went into the industrial catering business and soon after began his lengthy career in organized crime. (PSR ¶ 181).



Mr. Vitale was arrested on January 9, 2003 and has been incarcerated without interruption since that time. Almost immediately after his arrest, he began cooperating with the

SIMON & PARTNERS LLP

government. Mr. Vitale's cooperation was historic and groundbreaking and is detailed in the government's 122 page 5K1 letter to the Court.

Mr. Vitale has made the most of his lengthy period of incarceration. He has been a model inmate who did not receive a single incident or disciplinary report. (PSR ¶ 176). According to a prison progress report in the possession of the U.S. Probation Department, Mr. Vitale adjusted well to his incarceration and "has not [] presented any management concerns. He interacted appropriately with staff and other inmates." (PSR ¶ 176). Mr. Vitale "maintained a full-time work assignment and maintained clear conduct." (PSR ¶ 176). Mr. Vitale's work assignments included working in the quality assurance department of the UNICOR Federal Prison Factory where he received only positive work evaluations. (PSR ¶ 176). Mr. Vitale also voluntarily enrolled in, and completed, an Anger Management/Coping Skills course. (PSR ¶ 176). While incarcerated, Mr. Vitale has also found solace in his faith. He has developed a particularly close bond with a priest at the facility and regularly goes to confession. Twice a week, Mr. Vitale has assumed the responsibility of setting up the facility chapel and assists the priest in running his service.

As noted by the Department of Probation and verified by his voluminous medical records, Mr. Vitale has a history of serious health problems that the Court is respectfully urged to consider as a mitigating factor in imposing sentence. (PSR ¶ 170). Specifically, Mr. Vitale, who is 63 years of age, suffers from severe chronic coronary artery disease and hypertension. (PSR ¶ 170). Unfortunately, this condition is prevalent in Mr. Vitale's family and his father died from heart disease at the age of 66. (PSR ¶ 162). Mr. Vitale suffered his first heart attack at age 39 and underwent a cardiac catheterization. In 1998, at age 51, Mr. Vitale underwent a second

SIMON & PARTNERS LLP

cardiac catheterization, which revealed severe cardiac disease requiring "urgent" triple bypass surgery. A year later, Mr. Vitale underwent another cardiac catheterization and three heart grafts. (PSR ¶ 170.)

As a result of Mr. Vitale's congestive heart disease and hypertension, he has been twice hospitalized for angina with severe chest pains since his 2003 incarceration. On several occasions, it was necessary for Mr. Vitale to be transferred to a local area hospital outside of his prison facility to receive more advanced evaluation and treatment of his health issues. Mr. Vitale's medical records during his incarceration also reveal frequent complaints of chest pain, shortness of breath, dizziness and numbness in his extremities. He is examined monthly by a prison doctor and is regularly monitored by the cardiac/hypertension chronic care clinic. (PSR ¶ 171). In short, Mr. Vitale's physical ailments negatively affect his activities daily and will continue to do so for the rest of his life.

## IV. Mr. Vitale's Cooperation With The Government

Salvatore Vitale was "a violent member of organized crime" who spent "the majority of his life committed to that criminal enterprise." (5K1 Letter, p. 121). His criminal acts were heinous and included his involvement in multiple murders. The details of his crimes are well documented because Mr. Vitale testified about them repeatedly, under oath, at various trials presided over by this Court. Through his testimony, Mr. Vitale has demonstrated complete and extraordinary acceptance of responsibility for his numerous transgressions. Though Mr. Vitale was unable to restore life to his victims or provide solace to their families, he sought redemption

SIMON & PARTNERS LLP

in the only way he could – by assisting the government to prosecute and convict countless others and combat organized crime to the fullest extent.

The Court is now in the position of having to determine an appropriate sentence for Mr. Vitale by balancing the magnitude of his offenses with his remarkable and unprecedented government cooperation. While nothing can or should be said to diminish the gravity of Mr. Vitale's crimes, the Court is respectfully urged to consider that the government had no prior knowledge of most of the criminal acts to which Mr. Vitale pled guilty until Mr. Vitale voluntary revealed such acts. The government has acknowledged that "as a result of [Mr. Vitale's] own cooperation, the government learned about a host of criminal activity that Vitale and others were involved in, which was previously unknown to investigators. Vitale pled guilty to many of these crimes, including all of the most serious." (5K1 Letter, p. 14). Indeed, "at the time of his arrest, Mr. Vitale was charged with only one murder as a predicate act. Months later at his guilty plea, he pled guilty to eleven." (5K1 Letter, p. 16-17). Furthermore, the government has aptly noted that "most, if not all, of the available evidence as to his involvement in the crimes he pled guilty to consisted only of Vitale's own proffer-protected admissions. As a result of his debriefings and cooperation, Vitale also subjected himself to the possibility of the death penalty given his involvement in the 1999 death-eligible murder of Bonanno family captain Gerlando Sciascia." (5K1 Letter, p. 14).

The government's unparalleled 122 page 5K1 letter is a testament to the extraordinary efforts Mr. Vitale made to atone for his sins over the past seven-plus years. The government has characterized his cooperation as "unprecedented" (5K1 Letter, p. 1) and "groundbreaking by any measure" (5K1 Letter, p. 17). Mr. Vitale began cooperating shortly after his arrest and

7

## SIMON & PARTNERS LLP

subsequently "met with literally dozens of federal, state, and even foreign law enforcement officials." (5K1 Letter, p. 14). Throughout countless debriefings, Mr. Vitale was always "straightforward, credible, and truthful." (5K1 Letter, p. 14). His extensive cooperation included:

- meeting repeatedly with agents, detectives, and prosecutors for more than seven years and being forthright about his own criminal conduct and that of others (5K1 Letter, p. 14);

- turning over physical evidence that he maintained, including his address book, detailed loansharking records, and lists of proposed members for the various *Cosa Nostra* families, much of which was later admitted as evidence at various trials and providing information that led to the recovery of other evidence – including the remains of those murdered by the Bonanno family (5K1 Letter, p. 17);

- providing detailed accounts about more than thirty murders, murder conspiracies, and attempted murders, resulting in more than thirty defendants having been charged relating to these crimes (5K1 Letter, p. 2);

- testifying at six trials (all of which led to convictions) and being prepared to testify at many others (5K1 Letter, p. 2);

- providing reliable information used repeatedly in wiretap and search warrant applications, which yielded additional evidence that included the remains of at least three mafia victims buried long ago. (5K1 Letter, p. 2);

SIMON & PARTNERS LLP

- consenting to the forfeiture of $490,100.00 - money Mr. Vitale voluntarily turned over as part of his cooperation (5K1 Letter, p. 17). Additionally, in prosecutions in which Mr. Vitale testified, the government has secured forfeiture judgments of more than $20,000,000.00 (5K1 Letter, p. 6)

Mr. Vitale became a "crucial government witness in the longstanding, ongoing, and important fight against organized crime." (5K1 Letter, p. 1). He "identified more than 500 members and associates of *Cosa Nostra* in the United States and beyond, and he has provided crucial information about the manner in which these criminals operate, the structure and rules they have implemented and follow, and other details about every facet of their criminal enterprise." (5K1 Letter, p. 2). Mr. Vitale's cooperation was instrumental and crucial in prosecuting high ranking members of the Bonanno, Colombo, Gambino, and Genovese organized crime families. According to the government, Mr. Vitale's cooperation against the Bonanno family in particular resulted in "the conviction of dozens of members and associates and more than four bosses/acting bosses," which "substantially diminished that criminal enterprise." (5K1 Letter, p. 2). Indeed, the government noted that "[o]ver the course of [Mr. Vitale's] cooperation, the government has staged one of the most significant series of prosecutions against a single organized crime family, and Vitale was always a crucial and available witness. In all, he has provided important information against virtually every significant criminal supervisor in that enterprise over the last thirty years. And while the Bonanno family continues to exist and operate, there can be no question that its power, reputation, and reach have been substantially diminished." (5K1 Letter, p. 3). The government

9

SIMON & PARTNERS LLP

concluded that "Vitale's cooperation has been devastating to the very mafia to which he once swore allegiance and particularly to the Bonanno family." (5K1 Letter, p. 3)

With regard to the Bonnano family, the government unequivocally credits Mr. Vitale's information and testimony for directly leading to the conviction of the last four bosses and/or acting bosses and many other high-ranking and violent leaders including Bonanno family boss Joseph Massino, Bonanno family acting boss and acting consigliere Anthony Urso, Bonanno family acting boss/boss Vincent Basciano, and Bonanno family acting boss Michael Mancuso." (5K1 Letter, p. 38). The government noted that "given his rank in both the Bonanno family, and Cosa Nostra, Massino's conviction was among the most important in organized crime in the last decade" and that "Vitale's cooperation and testimony was essential to Massino's conviction." (5K1 Letter, p. 45). Massino ultimately received a life sentence.

Similarly, the government stated that "[t]he Urso prosecution likely stands as the most significant prosecution in a single organized crime family – and Salvatore Vitale was among the most crucial witnesses who provided information leading to the indictment and conviction of these defendants." (5K1 Letter, pp. 58-59). "Vitale provided evidence about virtually every crime charged in the Urso prosecution – and about all of the most serious crimes." (5K1 Letter, p. 70). "The compelling evidence gathered during the Urso investigation, including the availability of Vitale as a witness, ultimately led to guilty pleas by twenty-five defendants, which included substantial sentences for Bonanno family acting boss and acting consigliere Anthony Urso and Bonanno family acting underboss Joseph Cammarano, as well as substantial pleas for others." (5K1 Letter, p. 70). According to the government, the Urso prosecution "was significant

SIMON & PARTNERS LLP

in every way, and Vitale was a crucial witness as to almost every defendant and criminal act charged." (5K1 Letter, p. 93).

Aside from the numerous and significant convictions already obtained as a direct result of Mr. Vitale's efforts, his cooperation also opened the door to continued government investigations and prosecutions of the Bonnano family and organized crime as numerous other high-ranking members of the Bonanno family have decided to cooperate and provide important information to the government.[1] (5K1 Letter, pp. 2-3). The government noted that, "[a]s of approximately 2002, the Bonanno family was the only one of the five New York-based *Costa Nostra* families never to have a made member cooperate and testify in federal court. Today, less than a decade later, more than a dozen have cooperated, and while Vitale was not the first, there is no question that several cooperated based on the fear that Vitale's own information and testimony would lead to their arrest and conviction." (5K1 Letter, p. 4-5).

Mr. Vitale's cooperation was particularly difficult and painful because Joseph Massino was more than just his partner in crime for four decades. The two men are brothers-in-law. Mr. Massino is married to Mr. Vitale's sister and Mr. Massino served as the best man at Mr. Vitale's wedding. Thus, Mr. Vitale cooperated not just against his crime family but also his real family. Mr. Vitale had to face his brother-in-law in Court while he testified about Mr. Massino's unspeakable crimes. Mr. Vitale's own sister (Mr. Massino's wife), and other family members, were present in the courtroom seated directly behind Mr. Massino. The decision to cooperate against Mr. Massino and provide the critical testimony that ultimately sent his sister's husband to jail for life was truly onerous. Mr. Vitale and his immediate family were detested and shunned

---

[1] According to the government, a separate letter has been filed with the court *ex parte* and under seal detailing the ongoing cooperation of others that resulted directly from Mr. Vitale's own cooperation.

11

SIMON & PARTNERS LLP

by the rest of their family, their friends and their community. Mr. Vitale, his wife and sons were completely isolated from virtually every person they had ever known.  The government confirmed that Mr. Vitale made the decision to cooperate "at great peril to both himself and his family, which has already been the subject of various threats." (5K1 Letter, pp. 121-122).

### V.  A Sentence of Time Served is Warranted and Would Meet the Ends of Justice

Mr. Vitale was arrested on January 9, 2003 and has now been incarcerated for approximately seven years and ten months, which, with credit for good time, equates to a term of imprisonment of nearly ten years. (5K1 Letter, p. 10). Such a term is substantial by any standard and warranted in Mr. Vitale's case, despite the severity of his crimes, based on his

SIMON & PARTNERS LLP

unprecedented" and "groundbreaking" cooperation as set forth in the government's 122 page letter to the Court and its supplemental letter filed under seal. Cooperating witnesses are essential to achieving justice and perhaps no individual has done more to assist the government in its battle against organized crime than Mr. Vitale. According to the government, "without the benefit of cooperating witnesses, the government is often unable to prosecute individuals involved in crimes of this nature. Vitale's cooperation is a prime example – he provided information about scores of crimes, including murders, for which the investigations had long run cold." (5K1 Letter, p. 121).

A sentence of time served, based on the amount of time Mr. Vitale has currently served, would be entirely consistent with sentences meted out in past organized crime cases to cooperating defendants comparable to Mr. Vitale in magnitude, of which there are only a few. And although the benefit of a time served sentence would be significant to Mr. Vitale, such a sentence would be serious enough to sufficiently punish Mr. Vitale for his misdeeds while providing a meaningful incentive for others to cooperate in future cases.

Additionally, Mr. Vitale's cooperation was particularly difficult because the biggest target of the government's prosecutions was Mr. Vitale's own brother-in-law, Joseph Massino. Mr. Vitale's cooperation resulted in his sister's husband being sentenced to prison for the rest of his life. Mr. Vitale's cooperation tore his family apart. ████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████

SIMON & PARTNERS LLP

Furthermore, it is significant that most of the criminal conduct to which Mr. Vitale pleaded guilty, including ten of eleven murders, was only known to the government because of Mr. Vitale's own voluntarily admissions to such conduct. By disclosing these additional acts Mr. Vitale exposed himself to great risk including a potential death sentence. But he did so in order to provide complete information about his criminal actions and the acts of many others in an extraordinary effort to assist the government.

And of course, Mr. Vitale's cooperation put himself at great risk of physical harm for the rest of his life. Although Mr. Vitale's cooperation substantially diminished the Bonnano crime family, it continues to exist. For as long as it does, there will always be extremely dangerous individuals who would relish nothing more than violently ending Mr. Vitale's life. Regardless of when Mr. Vitale completes his sentence, he will never have peace as he will always be looking over his shoulder because he knows that he will forever be a marked man.

For the foregoing reasons, we respectfully request that the Court impose a sentence of time served, a sentence that renders justice with mercy.

Dated: New York, New York
       October 25, 2010

Respectfully submitted,

Brian D. Waller (BDW-7163)
Simon & Partners LLP
551 Fifth Avenue
New York, NY 10176
(212) 332-8900

cc: AUSA Greg D. Andres
